IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DALE MADDEN, | ) | |
| | ) | CASE NO. 5:14CV1461 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Dale Madden ("Madden") challenges the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying his claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381 *et seq*.  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is VACATED and the case is REMANDED for further proceedings consistent with this opinion.

**I.  Procedural History**

On December 29, 2010, Madden filed an application for SSI alleging a disability onset date of January 1, 1993 and claiming he was disabled due to a broken pelvis.  (Tr. 187, 213.)  Madden subsequently amended his onset date to his application date, December 29, 2010.  (Tr. 49, 208.)  His application was denied both initially and upon reconsideration.  (Tr. 108-120, 122-

135.)  Madden timely requested an administrative hearing.

On February 6, 2013, an Administrative Law Judge ("ALJ") held a hearing during which Madden, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 45-81.)  On April 26, 2013, the ALJ found Madden was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  (Tr. 28-38.)  The ALJ's decision became final when the Appeals Council denied further review.[1]  (Tr.1-5.)

## II.  Evidence

### Personal and Vocational Evidence

Age forty-one (41) at the time of his administrative hearing, Madden is a "younger" person under social security regulations.  *See* 20 C.F.R. § 416.963 (c).  Madden has a sixth grade education and no past relevant work.  (Tr. 37, 52.)

### Relevant Medical Evidence

In 2010, Madden presented to the emergency room ("ER") on at least seventeen (17) occasions for treatment of his chronic back pain.[2]  During these visits, Madden complained principally of lower back pain radiating down his left leg, often (though not always) as a result of slipping or falling.  (Tr. 297, 488, 295, 480, 291, 284, 415, 404, 390, 380, 365, 339, 334.)  He generally described severe pain, frequently rating it a 10 on a scale of 10.  (Tr. 480, 415, 404, 354.)  ER treatment notes during this time period also contain references to complaints of

---

[1] Madden filed previous applications for child disability benefits and SSI on April 8, 2008.  (Tr. 85.)  These applications were denied both initially and upon reconsideration.  *Id.*  A hearing was conducted before an ALJ on September 2, 2010.  *Id.*  That ALJ issued a decision on October 12, 2010, denying Madden's applications. (Tr. 85-99.)  In the decision at issue herein, the ALJ found that "because of the introduction of evidence, new and material to the determination of disability, it is found that it would not be appropriate to be bound, in their entirety, by the findings of [the previous] ALJ." (Tr. 28.)

[2] Specifically, in 2010, Madden presented to the ER on February 25 (Tr. 297-299); April 5 (Tr. 488-493); April 26 (Tr. 295-296); June 9 (Tr. 480-485); June 18 (Tr. 291-292); July 4 (Tr. 287-290); September 4 (Tr. 284-286); September 5 (Tr. 440-460); September 9 (Tr. 414-423); October 6 (Tr. 402-411); October 9 (Tr. 388-401); October 10 (Tr. 376-387); October 24 (Tr. 363-375); December 23 (Tr. 353-359); November 28 (Tr. 348-352); December 27th (Tr. 338-342); and, December 30 (Tr. 333-337.)

numbness and tingling in his left leg.  (Tr. 488, 295, 287, 365-366.)  Examination often revealed some or all of the following: tenderness to palpation in the lumber region; limited range of motion; left lumbar spasm; antalgic or "abnormal" gait; and deep tendon reflexes 2+.  (Tr. 489, 295, 481, 291, 287, 289, 418, 349, 334.)  Some treatment notes indicate positive straight leg raising on the left (Tr. 415, 381, 369), while others reflect negative straight leg raising bilaterally.  (Tr. 297, 489, 481, 287, 289, 286, 349, 339.)  During at least one ER visit, treatment notes indicate Madden's pain appeared to be "exaggerated."  (Tr. 334.)  Madden was generally discharged the same day, many times with prescriptions for various narcotic pain medications including Vicodin and Percocet.[3]  (Tr. 298, 490, 296, 482, 407, 369, 355, 349, 340.)

Numerous imaging studies were conducted during this time period.  In February 2010, x-rays of Madden's sacrum, pelvis, and coccyx were negative for fracture or acute bony abnormality. (Tr. 317-318, 666-667.)  In April 2010, an MRI of Madden's lumbar spine revealed a nondisplaced sickle fracture with associated bone marrow edema; and, mild diffuse annular disk bulge at the L3-L4 level which is slightly eccentric towards the left resulting in mild central spinal stenosis but no focal disk protrusion.  (Tr. 626.)  In September 2010, a CT of Madden's cervical spine showed no signs of acute trauma.  (Tr. 473.)  On October 6, 2010, x-rays of Madden's lumbar spine showed no bony abnormality and "no etiology for the patient's pain." (Tr. 412.)  Lumbar spine x-rays taken three days later were also negative.  (Tr. 400.)  X-rays of Madden's lumbar spine were taken again on October 24, 2010 and were, again, negative.  (Tr.

---

[3]Beginning in July 2010, ER doctors at Barberton Hospital began to express concern regarding Madden's significant narcotic pain medication use.  (Tr. 288.)  During a visit on July 4, 2010, an ER physician observed: "We pulled an OARRS report where he found that [Madden] received upwards of 100 Vicodin in June along with 15 Percocet.  He was noted to be going to other emergency rooms.  He initially denied this but then admitted that he has been going to other emergency rooms.  He received a significant amount of narcotics in April and May also." *Id.*  After this visit, Madden started visiting a different emergency room, where he was prescribed narcotic pain medications.  (Tr. 403.)  In October 2010, that emergency room also became aware of Madden's heavy narcotic pain medication use, and advised him that "he will not get any other pain medications here at the emergency department."  (Tr. 391.)  In subsequent visits to that same emergency room, however, Madden was nonetheless prescribed narcotic pain medication.  *See e.g.*, Tr. 369, 355, 349, 339-340, 334.

373.)

In addition to his ER visits, Madden presented to various physicians for office visits in 2010.  In February 2010, Madden presented to neurologist Hugh Miller M.D., for treatment of his seizures.  (Tr. 573-576.)  Dr. Miller's examination notes reveal Madden had a normal gait at that time.  (Tr. 575.)  In April 2010, Madden presented to Anmar Kanaan, M.D., of the Internal Medicine Center of Akron ("IMCA") complaining of back pain radiating down his left leg, as well as left leg numbness.  (Tr. 621.)  Dr. Kanaan noted abnormal gait; lumbar spine tenderness; and, abnormal ranges of motion in Madden's neck and thoracic spine.  (Tr. 622.)  Several months later, in July 2010, Madden presented to Shweta Diwakar, M.D., of IMCA for "worsening back pain that is sharp and stabbing."  (Tr. 555.)  On examination, Dr. Diwakar noted lumbar spine tenderness and positive straight leg raising on the left at a 30 degree angle.  (Tr. 556.)  Dr. Diwakar referred Madden to physical therapy.  (Tr. 557.)

In August 2010, Madden presented to Holly Eltrevoog, M.D., with complaints of lower back pain; and, numbness and burning in his left leg.  (Tr. 618.)  Madden reported his left leg felt weak and unstable, and indicated he had been ambulating with a cane for the past two to three months.  *Id.*  He also stated he had been unable to attend physical therapy.  *Id.*  Madden reported tenderness with palpation involving his lower lumbar spine and left sacroiliac region, as well as decreased sensation involving the L4, L5, and S1 nerve distribution of his left foot.  *Id.*  Dr. Eltrevoog prescribed Vicodin and referred Madden to physical therapy.  *Id.*

Madden was seen by various physicians at IMCA in August, September and October 2010.  (Tr. 535-540, 542-553.)  In his August 2010 visit with Ken Koon Wong, M.D., it was noted that Madden had been prescribed a cane.  (Tr. 548.)  On examination, Dr. Wong noted tenderness and abnormal range of motion in Madden's lumbar spine.  (Tr. 550.)  In September 2010, it was noted that Madden "does not appear healthy." (Tr. 543.)  He was observed to have a normal gait, but abnormal ranges of motion in his thoracic and lumbar spines.  *Id.*  In October 2010, Dr. Wong noted an abnormal gait, and, tenderness and abnormal range of motion in Madden's lumbar spine.  (Tr. 536.)  Dr. Wong's treatment note also indicates Madden went to

4

physical therapy but was discharged because "patient does not think it is helping and also has been cancelling 3 times."  (Tr. 535.)  At this visit, Madden was asked to sign a pain contract and submit to a "tox and oxycodone" urine screen.  (Tr. 537.)  He was also referred to pain management.  *Id.*

Madden presented to orthopaedist Ryan Gasser, M.D., in October 2010.  (Tr. 614.) Madden reported he had "gone from using a cane to using a walker secondary to the pain."  *Id.* Dr. Gasser noted Madden "does not describe any real leg weakness."  *Id.*  Rather, Madden reported "burning, dysesthetic pain into the left lower extremity originating from the back," a "clunking sensation in his back" with movement, and difficulty sitting on the affected side.  *Id.* On examination, Madden was anxious, hyperventilating, and, yelling in pain.  *Id.*  Dr. Gasser found that "strength grading is difficult secondary to poor effort" and "muscle examination is associated with a collapsing effort."  *Id.*  Dr. Gasser prescribed epidural steroid injections, which Madden underwent in November and December 2010.  (Tr. 614, 343, 360, 362.)

Madden continued his pattern of frequent ER visits in 2011.  In that year, Madden visited the ER on at least fifteen (15) occasions for treatment of back, leg, and neck pain.[4]  Between January and September 2011, Madden presented primarily with complaints of severe lower back pain radiating down his left leg.  As in the previous year, examination often revealed pain to palpation and tenderness in the lumbar region; muscle spasm; and/or deep tendon reflexes 2+. (Tr. 712, 709, 699, 683.)  However, during his 2011 visits, Madden was also sometimes found to have a normal gait, normal motor strength, and/or negative straight leg raising bilaterally.  (Tr. 707, 702, 692, 691.)  On at least one occasion, in January 2011, an ER physician observed that Madden's pain "appears exaggerated."  (Tr. 324.)

On January 11, 2011, Madden returned to Dr. Wong for treatment of constant back pain

---

[4] In 2011, Madden presented to the ER on January 11 (Tr. 323-332); February 7 (Tr. 714-715); February 10 (Tr. 711-713); February 17 (Tr. 709-710); March 23 (Tr. 705-708); May 20 (Tr. 702-703); June 9 (Tr. 699-700); June 17 (Tr. 697-698); June 30 (Tr. 692-695); July 20 (Tr. 685-691); August 7 (Tr. 681-684); September 12 (Tr. 783-787); September 29 (Tr. 670-671); October 9 (Tr. 729-730); and, November 10 (Tr. 721-723.)

radiating to his left leg, which he described as a 10 on a scale of 10.  (Tr. 530-531.)  Examination revealed abnormal gait, as well as thoracic and lumbar spine tenderness.  (Tr. 531.)  Dr. Wong found Madden's "condition seemed inconsistent with information provided."[5]  (Tr. 532.)  The following day, Madden presented to Dr. Miller with complaints of back pain and numbness in his left leg and both feet.  (Tr. 565-568.)  Dr. Miller noted an antalgic gait, but normal "tone and power" in Madden's bilateral upper and lower extremities.  (Tr. 567.)  Dr. Miller ordered nerve conduction studies for both of Madden's legs and an EMG of his left leg, all of which came back normal.  (Tr. 567, 794.)  That same day, Madden underwent x-rays of his lumbar spine, which showed some straightening of the lumbar lordosis but was otherwise normal.  (Tr. 664.)  Madden also underwent an x-ray of his left knee, which showed (1) a corticated ossification projecting in the intercondylar notch on the frontal image; (2) joint effusion; and, (3) degenerative changes.  (Tr. 663.)  Later in January 2011, Madden presented to George Bartalan, M.D., complaining again of back pain, and left leg numbness and tingling.  (Tr. 642-646.)  Madden came to the appointment with a cane.  (Tr. 643.)  Dr. Bartalan observed that Madden's back was very tender to palpation in the paraspinal muscles and showed decreased range of motion secondary to pain.  *Id.*

Madden thereafter presented to Leuy Tong, M.D., on February 5, 2011, March 1, 2011, and March 22, 2011.  (Tr. 658-662.)  Dr. Tong's treatment notes indicate Madden complained of severe tenderness and "immense pain" in his lower back and, further, that he was using a cane at each of these visits.  *Id.*  Dr. Tong observed Madden could ambulate, but that he was either limping or walking slowly with the cane.  *Id.*  On the last of these visits, Dr. Tong noted Madden's "pain appears to be out of proportion with the exam."[6]  (Tr. 658.)  On July 11, 2011,

---

[5]  Dr. Wong further noted Madden had not been taking Percocet for five days but his THC tox screen was found to be positive.  (Tr. 532.)  Dr. Wong's treatment note indicates he planned to talk with another physician at IMCA about terminating the doctor-patient relationship.  *Id.*

[6]  Dr. Tong's treatment note from March 1, 2011 also notes that Madden "was getting chronic narcotics for his pain and did sign a [pain] contract; however, he was dismissed from Dr.

Madden presented to Gary Machado, M.D., complaining that he was in severe distress.  (Tr. 657.)  Madden became angry, used profanity, stated nobody was doing anything for his pain, and threatened to go home and shoot himself.  *Id.*  Dr. Machado stated "it is very difficult to perform a physical exam on this patient as he will not let me touch the area . . . I cannot further assess where or what the cause of his problem is."  *Id.*  After discussion, Madden calmed down and agreed to make an appointment with pain management.  *Id.*  Ten days later, Madden presented to Pramesh Patel, M.D., "moaning with complaints of extreme pain."  (Tr. 656.)  Dr. Patel noted tenderness along the mid-lumbar spine and mild weakness in the lower extremities.  *Id.*  Madden was given non-narcotic pain medication.[7]  *Id.*

Beginning in September 2011, Madden began complaining of severe neck pain radiating into his shoulder and down his arm.  (Tr. 784-787.)  The record reflects several ER visits, as well as a number of visits with Dr. Machado and Tony Lababidi, D.O., to address this condition. (Tr. 670-671, 729-730, 721-723, 744-745, 743, 757-758, 742, 751-753.)  An MRI of Madden's cervical spine showed a large right-sided disc extrusion at C7-T1 that impinged on the ventral aspect of the cord, and borderline stenosis.  (Tr. 754-755.)  Thereafter, on December 23, 2011, Madden underwent surgery; i.e., a C6-C7 anterior cervical decompression, fusion with plate. (Tr. 773-777.)

Meanwhile, in November and December 2011, Madden also sought treatment from Dr. Lababidi for his continuing lower back pain.  (Tr. 757-758, 751-753.)  During these visits, Dr. Lababidi noted tenderness to palpation in the lumbar paravertebral muscles; positive left facet loading; decreased range of lumbar motion; positive straight leg raising on the left; limited range

---

Wong's practice due to breaching the contractual agreement for narcotics/pain medicine." (Tr. 659.)

[7] Several imaging studies were conducted during this time frame.  On May 20, 2011, x-rays were taken of Madden's left leg, which were normal.  (Tr. 704.)  Lumbar spinal x-rays were taken on June 9, 2011, which showed straightening of the lumbar lordosis but no acute findings. (Tr. 701.)  Lumbar spinal x-rays were again taken on June 30, 2011, which showed "slight straightening of the usual lumbar lordosis" but were otherwise normal.  (Tr. 696.)

7

of motion of Madden's left upper extremity; and, antalgic gait.  (Tr. 757, 752.)  These treatment notes also indicate limited range of motion, diminished sensation, and "severe decreased strength" in Madden's left upper extremity.  (Tr. 757, 752.)

Madden visited the ER on two occasions in March 2012 for treatment of severe neck pain.  (Tr. 868-869, 762-766.)  An x-ray of his cervical spine was taken on March 19, 2012, which showed mild neural foraminal impingement on the right side at C5-6 and C6-7 but was otherwise unremarkable.  (Tr. 769.)  That same day, Madden presented to Maged Fouad, M.D., for treatment of his back and neck pain.  (Tr. 748-750.)  On examination, Dr. Fouad noted severe tenderness to palpation over the cervical paravertebral spine, trapezium, and left clavicle, as well as abnormal cervical range of motion.  (Tr. 749.)  She also observed tenderness over the lumbar paravertebral muscles; positive left lumbar facet loading; decreased lumbar range of motion; SI joint tenderness on the left; positive straight leg raising on the left; limited range of motion of the left upper extremity; diminished sensation over the left upper and lower extremities; severe decreased strength of the left upper extremity; and, antalgic gait.  *Id.*

On March 22, 2012, Madden underwent an MRI of his lumbar spine.  (Tr. 760-761.)  This MRI revealed (1) borderline central canal stenosis at the L4-L5 level; (2) moderate to severe central canal stenosis at the L3-L4 level due to disk bulging and broad-based left paracentral disk herniation; and, (3) L4-L5 right intraforaminal disk herniation with possible mass-effect on the exiting right L4 nerve root.  (Tr. 761.)  Shortly thereafter, Madden presented to Sarel J. Vorster, M.D., the surgeon who performed his neck surgery in December 2011.  (Tr. 892-893.)  Dr. Vorster discussed the results of the MRI, noting that "[a]t the L3-4 level, there is broad-based paracentral disk herniation causing thecal sac and nerve root compression."  (Tr. 892.)  Dr. Vorster also noted that Madden was "quite uncomfortable" and unable to place any weight on his left leg.  *Id.*  He remarked that "[i]t is difficult to examine his strength in the leg because of the pain, but he seems to be unable to squat down, step onto a step-up or even flex the hip."  *Id.*  He also noted positive straight leg raising, and tenderness in the low back area.  *Id.*  Dr. Vorster referred Madden for epidural injections and discussed the possibility of back surgery

but was concerned about rushing into surgery "so soon after his cervical fusion barely three months ago." (Tr. 892-893.)

Madden presented to Dr. Labibidi on April 17, May 15, June 12, July10, and August 7, 2012 with complaints of persistent neck and back pain.  (Tr. 861-863, 858-860, 854-856, 850-852, 847-849.)  During each of these visits, Dr. Labibidi observed (1) severe tenderness to palpation over the cervical paravertebral spine, trapezium, and left clavicle; (2) abnormal cervical range of motion; (3) tenderness to the lumbar paravertebral muscles; (4) positive left lumbar facet loading; (5) decreased lumbar range of motion; (6) SI joint tenderness on the left; (7) positive straight leg raising on the left; (8) limited range of motion in the left upper extremity; (9) diminished sensation over the left upper extremity and left lower leg; and, (10) antalgic gait.[8]  (Tr. 862, 859, 855, 851, 848.)  On April 17, 2012, Dr. Lababidi referred Madden to physical therapy and prescribed a TENS unit.  (Tr. 863.)  The following month, on May 15, 2012, Dr. Lababidi noted Madden experienced difficulty rising from a seated position.  (Tr. 858.)  At this visit, Dr. Lababidi prescribed Madden a walker "due to unsteady gait." (Tr. 860.)  Madden was also ordered to continue with the TENS unit and complete physical therapy.  *Id.*

On June 12, 2012, Dr. Lababidi's notes indicate that "patient states his insurance company will not pay for a walker so he continues to use his cane." (Tr. 854.)  These notes also state lumbar epidural steroid injections will be scheduled once Madden completes physical therapy.  (Tr. 856.)  On July 10, 2012, Madden reported the TENS unit was providing some relief and he was scheduled to begin physical therapy later in the month.  (Tr. 850, 852.)  The record reflects Madden attended physical therapy sessions on July 23, 2012, August 27, 2012, and August 28, 2012.  (Tr. 816-817, 810-811, 808-809.)  At the last of these sessions, Madden

---

[8]  In addition, in April, May, and June 2012, Dr. Lababidi noted severe decreased strength in Madden's left upper extremity. (Tr. 862, 859, 855.)  In July 2012, he found diminished strength in Madden's bilateral upper extremities. (Tr. 851.)  In August 2012,  Dr. Lababidi observed diminished strength in Madden's left upper extremity and left lower extremity, as well as impaired coordination.  (Tr. 848.)

indicated he "got worse" with physical therapy and did not wish to continue.  (Tr. 808.)  He was discharged from therapy with a "poor prognosis." *Id.*

Madden returned to Dr. Lababidi in September and October 2012, at which time Dr. Lababidi noted the same examination findings as set forth above, including antalgic gait and positive straight leg raising on the left.  (Tr. 844, 838.)  Additionally, at these visits, Dr. Lababidi noted limited range of motion of the left upper extremity; diminished sensation over the left upper extremity and left lower leg; diminished strength in the left upper and lower extremities; and, impaired coordination.  (Tr. 844, 838.)  On September 4, 2012, Dr. Lababidi ordered a series of lumbar epidural steroid injections ("LESI").  (Tr. 845.)  Madden underwent the first injection on September 21, 2012.  (Tr. 841.)  The following month, Madden reported increased pain in both legs since the injection.  (Tr. 837.)  Thereafter, Dr. Lababidi discontinued the LESI series, and prescribed bilateral sacroiliac ("SI") joint injections, which Madden underwent on October 19, 2012 and November 2, 2012.  (Tr. 839, 835-836, 873-74.)

Meanwhile, Madden presented to Dr. Vorster on October 8, 2012.  (Tr. 886-890.)  At this visit, Dr. Vorster observed an "unstable" gait and tenderness to palpation of the lumbar spine.  (Tr. 888.)  He also noted decreased strength in Madden's lower extremities (hips, knees, and ankles), but commented that "patient's exam is limited by severe pain."[9]  (Tr. 888-889.)  Dr. Vorster ordered a repeat MRI of the lumbar spine, which Madden underwent on October 29, 2012.  (Tr. 889, 878.)  This MRI revealed the following: "At the L4-L5 level, there is mild diffuse disk bulging, end plate ossify formation, and facet hypertrophy. Is borderline to canal stenosis.  There is a superimposed right intraforaminal disk herniation causing probable mass-effect on the exiting right L4 nerve root.  There is minimal left neural foraminal narrowing."  (Tr. 878.)  At the L3-L4 level, the MRI showed disk bulging and broad-based disk herniation with moderate central canal stenosis, mild facet hypertrophy, and minimal bilateral neural

---

[9]This finding is inconsistent with another notation in Dr. Vorster's treatment note that Madden had normal range of motion and muscle strength in "all extremities with no pain on inspection."  (Tr. 888.)

foramina narrowing. *Id.* Finally, at the L5-S1 level, the MRI showed minimal disk bulging, mild bilateral facet hypertrophy, and mild bilateral neural foramina narrowing. *Id.*

Madden returned to Dr. Vorster on October 29, 2012. (Tr. 881-885.) At that time, Dr. Vorster found Madden's spine had normal flexion and extension and stated "patient is in severe pain that seems to be mechanical in nature." (Tr. 883.) Madden's gait was described as "limp and [using] cane." *Id.* Dr. Vorster assessed spinal stenosis of the lumbar region, and radiculitis. (Tr. 884.) With regard to the repeat MRI, Dr. Vorster noted as follows: "Reviewed MRI from today and MRI from earlier in the year. Scans are very similar and there is no additional degeneration. Explained to patient and spouse that he would not benefit from any surgical fusion of the spine at this time." *Id.* Dr. Vorster also noted "no instability or neural compromise." *Id.* He recommended Madden discuss the possibility of radial frequency ablation ("RFA") treatment with Dr. Lababidi. *Id.*

The next day, Madden presented to pain management physician Matthew Jones, M.D. (Tr. 875-877.) Madden reported he underwent his first SI joint injection on October 19, 2012, and stated his pain level went from a 10 to a 6. (Tr. 875.) Dr. Jones noted abnormal range of motion in Madden's lumbar spine; SI joint tenderness bilaterally; and, an antalgic gait. (Tr. 876.) He also observed that Madden walked with a cane. *Id.*

Madden returned to Dr. Lababidi on November 27, 2012, several days after receiving his second SI joint injection. (Tr. 870-872.) Madden reported experiencing no relief after this injection. (Tr. 870.) Dr. Lababidi noted abnormal range of motion in Madden's lumbar spine; SI joint tenderness bilaterally; and, an antalgic gait with cane. (Tr. 871.) On December 18, 2012, Madden presented to Dr. Jones, reporting pain in his neck, back, and knees. (Tr. 916-918.) Dr. Jones noted Madden was "grunting in pain" and that he "rises from a seated position with difficulty." (Tr. 916.) Among other examination findings, Dr. Jones observed Madden had positive straight leg raising on both the left and right; positive lumbar facet loading on the left; abnormal range of motion in the lumbar spine; and, an antalgic gait with walker. (Tr. 917.) Dr. Jones ordered bilateral lumbar facet joint injections, which Madden underwent on December 21,

11

2012.  (Tr. 918, 914-915.)

On January 7, 2013, Madden presented to Dr. Machado, at which time he reported "he was called in for a pill count for pain mgmt, and was unable to get a ride, therefore he was dismissed." (Tr. 894.)  Madden stated the pain injections had helped, but he still experienced weakness in his legs.  *Id*.  Dr. Machado noted Madden was "using walker for gait."  *Id*.  Madden was thereafter apparently able to re-establish treatment with his pain management physicians, and returned to Dr. Jones on January 23, 2013.  (Tr. 910-913.)  At this time, Madden reported decreased lumbar pain, increased bilateral knee pain, and numbness in his hands.  (Tr. 910.)  Dr. Jones noted tenderness and decreased range of motion in the lumbar spine; bilateral lumbar facet loading; restricted extension and flexion of the knee; positive straight leg raising on the left and right; and, an antalgic gait "with walker." (Tr. 911.)

Later in January 2013, Madden returned to Dr. Vorster for treatment of his back pain. (Tr. 897-900.)  Madden indicated the December 2012 facet joint injection had reduced his pain from a 10 to a 5, but that he still had numbness in his feet and hands, and his knees "are now hurting worse." (Tr. 897.)  Dr. Vorster noted that "patient has been using a walker because of falling with cane since he can't feel his feet."  *Id*.  Dr. Vorster found normal upper and lower extremity strength, but noted reduced bilateral grip strength and "diminished effort due to pain." (Tr. 899.)  He described Madden's gait as "slow [and] unsteady."  *Id*.  Dr. Vorster ordered lumbar spine x-rays, which Madden underwent the same day.  (Tr. 902.)  The x-rays were reported to be "within normal limits."  *Id*.

On February 13, 2013, Madden presented to Dr. Lababidi for his second bilateral lumbar facet joint injection.  (Tr. 907-908.)  Later that month, he returned to Dr. Lababidi for a follow-up visit.  (Tr. 903-905.)  Madden reported some relief from the injection, but indicated he had come down with the flu two days later which caused the pain to return due to vomiting.  (Tr. 903.)  Dr. Lababidi noted tenderness and decreased range of motion in the lumbar spine; full range of motion in the extremities; normal motor strength bilaterally; normal coordination; and,

"antalgic gait with a walker." (Tr. 903-904.)  Dr. Lababidi ordered a lumbar RFA.[10]  (Tr. 904.)

*Hearing Testimony*

During the February 6, 2013 hearing, Madden testified to the following:

- He attended school through the sixth grade. (Tr. 52.)  He had a learning disability. (Tr. 53.)  He dropped out of school because he was four years older than his classmates due to the fact that "they kept failing me in grade school." *Id.* He has had no vocational training. *Id.*

- He received social security disability benefits beginning in 1993 for his learning disability. (Tr. 53.)  He lost these benefits in 2005, however, when he was incarcerated for "hit[ting] a guy with two baseball bats." (Tr. 54.)

- He lives with his girlfriend in a three-story house. (Tr. 51.)  When he has to climb the stairs to the second floor, he takes one step at a time and holds on to two railings for support. (Tr. 51-52.)  He used to have a driver's license, but lost it due to child support and DUI issues. (Tr. 52.)

- He has a history of substance abuse, and went to rehab in the 1990's.  He has not had any alcohol in five years.  He does smoke marijuana every other day.  He does not use any other street drugs. (Tr. 54, 59, 61.)

- He suffers from chronic pain in his neck, lower back, and knees.  He had surgery for his neck pain but it has not helped. (Tr. 58.)  To the contrary, his neck "feels worse since the surgery." (Tr. 60.)  He gets bad headaches that radiate down into his lower back. *Id.*  He rates his neck pain a 10 on a scale of 10 "because when I move my head it pulls my spine and it aches." (Tr. 61.)  In addition, there are screws in his neck from the surgery which hurt when it gets cold outside. *Id.*

- He rates his lower back pain as ranging between an 8 and a 10, on a scale of 10. (Tr. 61.)  He also experiences numbness and tingling in his left leg, and "real bad" pain in both of his knees. (Tr. 58, 60.)  He sees a pain management doctor and receives injections about once a month. (Tr. 55.)  The last injection gave him 70% relief for two weeks, but then the pain returned. (Tr. 70.)  He has been using a walker for the last two months. (Tr. 52.)  Prior to that, he used a cane. *Id.*

---

[10] The only physician opinions in the record are those of state agency, non-examining physicians William Bolz, M.D., and Diane Manos, M.D. (Tr. 115-117, 128-130.)  Dr. Bolz's Physical RFC Assessment is dated March 5, 2011. (Tr. 115-117.)  Therein, he opined Madden could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8 hour workday; and, sit for about 6 hours in an 8 hour workday. (Tr. 115.)  Dr. Bolz further concluded Madden had an unlimited capacity to climb stairs and ramps, but could never climb ladders, ropes, and scaffolds. *Id.*  He also found Madden has unlimited push/pull capacity and could frequently stoop, kneel, crouch, and crawl. (Tr. 115-116.)  Finally, Dr. Bolz concluded Madden should avoid all exposure to hazards such as machinery, heights, etc. (Tr. 116.)  Dr. Manos completed a Physical RFC on October 3, 2011. (Tr. 128-130.)  She opined that Madden had the same limitations as that set forth in Dr. Bolz's opinion. *Id.*

However, he stopped using the cane when his left leg started "going numb" and he began falling down.  *Id.*

- He takes Flexeril, Neurontin, and Percocet for his pain.  (Tr. 55.)  These medications "help but they don't relieve the full pain."  (Tr. 57.)  He attempted physical therapy but "they wouldn't touch me."  (Tr. 58.)  The physical therapy "was hurting me worse than it would help."  *Id.*  He has a TENS unit but it does not relieve his pain.  (Tr. 59.)  He also takes medication for his seizures, thyroid condition, depression, and anxiety.  (Tr. 56.)  He does not experience side effects from his medications.  (Tr. 57.)

- He can stand for 10 minutes before needing to sit down.  (Tr. 67.)  Sitting is "terrible" for him.  (Tr. 67.)  He can only sit on the right side of his body; otherwise, his left foot and leg go numb.  *Id.*  He can sit for no more than five to ten minutes before having to stand.  (Tr. 67-68.)  Walking, standing, bending, sitting and "moving around" worsen his pain.  (Tr. 60, 68.)

- In addition to his back, neck, and knee pain, he experiences numbness in his hands and feet.  (Tr. 59, 67.)  When he tries to lift something, his hands go numb and he drops whatever he is holding.  (Tr. 59, 65.)  He cannot lift his arms over his head.  (Tr. 79.)

- To relieve his pain, he lays in bed all day.  (Tr. 60.)  He normally gets up at 7:30 a.m.  (Tr. 62.)  His girlfriend makes him breakfast, and he lays on his right side watching television for a few hours.  *Id.*  At around 11:00 a.m., he goes back upstairs and lays down for the rest of the day.  *Id.*  His girlfriend brings him lunch and dinner.  *Id.*  He is unable to help with any household chores.  *Id.*  He cannot cook for himself because he is not able to stand long enough.  (Tr. 63.)  He cannot do laundry or the dishes.  *Id.*  His girlfriend does the grocery shopping.  *Id.*  Sometimes, he will go with her but he stays in the car because it is too painful for him to walk through the store.  (Tr. 63-64.)

- His doctor has encouraged him to "get up and move around."  (Tr. 63.)  Once or twice a month he is able to go downstairs and move around a little bit.  (Tr. 66.)  When he has doctor appointments, his girlfriend helps him downstairs and drives him to the doctor's office.  Sitting in the waiting room is "a lot of agony and pain."  *Id.*

- His pain causes him to be depressed and anxious.  (Tr. 69.)  He also gets angry and "aggravated" easily because he cannot do the things he used to do.  *Id.*

- His family visits him occasionally.  He does not have any hobbies, other than watching television.  He has no pets.  He does not know how to use the computer.  (Tr. 64.)

The ALJ instructed the VE to assume Madden had no past relevant work.  (Tr. 72.)  The ALJ then posed the following hypothetical:

Okay. I want you to assume an individual claimant's age, education, and lack of past relevant work, of course.  Please assume that the individual is limited to light work in that he can walk and stand up to six hours per day but cannot walk and stand more than one hour at a time.  And then must sit or shift positions for three

14

> to four minutes, every hour, while remaining on task. The individual cannot climb ladders, ropes, or scaffolds. Cannot work around heights or dangerous moving machinery. Would be limited to simple, routine tasks and low stress work, and I'll define that as involving few work place changes. The changes are introduced gradually and the work would not involve any fast production rate pace or quotas. Are there any jobs within that hypothetical that such an individual can perform?

(Tr. 73.) The VE identified three jobs that such an individual could perform: (1) electrical accessories assembler (2,507 positions in the State of Ohio and 42,093 in the United States economy); (2) inspector/hand packager (3,010 positions in Ohio and 48,681 positions in the U.S. economy); and, (3) light duty production worker (1, 105 positions in Ohio and 18,563 positions in the U.S. economy). (Tr. 73-74.)

> The ALJ then posed a second hypothetical as follows:

> Okay. For the second hypothetical, Mr. Swick, please assume the individual is limited to sedentary work. Again, would be limited to simple, routine tasks and low stress work as I previously defined. Are there any sedentary jobs such an individual can perform?

(Tr. 74.) The VE testified such an individual could perform the following jobs: (1) printed circuit board inspector (1, 082 positions in the State of Ohio and 22,156 positions in the U.S. economy); (2) small parts assembler (1,216 positions in Ohio and 20,420 positions in the U.S. economy); (3) inspector/hand packager (2,634 positions in Ohio and 42,595 positions in the U.S. economy); and, (4) gate guard (1, 768 positions in Ohio and 47, 787 positions in the U.S. economy). (Tr. 74-75.)

The ALJ then asked "with regard to the jobs that you gave me, what would be the tolerance for– an employer tolerance for being off task during the day?" (Tr. 75.) The VE testified that "anything over 20 to 21 minutes, which is, approximately, five percent of the eight-hour workday would preclude competitive employment." *Id*. The ALJ then asked "what is the employer tolerance for absenteeism at these jobs?" (Tr. 76.) The VE testified that anything more than one unscheduled absenteeism per month would preclude competitive employment. *Id*.

Madden's attorney then asked the VE the following question: "when it comes to these different jobs that you've identified, do you believe that any of them exist at the competitive

level if the individual had to lie down at unscheduled times throughout the day?"  (T. 76.)  The VE testified such a limitation would "eliminate potential for competitive employment."  (Tr. 77.)

Madden's attorney then added, to the second hypothetical, the condition that the individual would be limited to "occasional bilateral use of the hands and occasional reaching bilaterally and a sit/stand option, at will, instead of just the sedentary work." (Tr. 77.)  The VE first noted that the previously identified jobs already included a sit/stand option.  *Id.*  He then testified each of the three identified light work jobs (electrical accessory assembler, inspector/hand packager, and light production worker) would be eliminated by the occasional bilateral hand and reaching restrictions.  *Id.*  With regard to the previously identified sedentary jobs, the VE testified the inspector/hand packager job would be eliminated but the printed circuit board inspector and gate guard jobs would be feasible.  (Tr. 77-78.)

### III.  Standard for Disability

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201. The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

## IV.  Summary of Commissioner's Decision

The ALJ found Madden established medically determinable, severe impairments, due to degenerative disc disease of the cervical and lumbar spines, substance abuse, learning disability and depression; however, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (Tr.  30- 32.)  Madden was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work.  (Tr. 32- 37.) The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine Madden was not disabled.  (Tr. 37-38.)

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing*

17

*Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. Analysis

### Listing 1.04

In his first assignment of error, Madden argues the ALJ erred in failing to find that he met or equaled the requirements of Listing 1.04A. Relying on *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411 (6th Cir. 2011), Madden asserts the ALJ failed to sufficiently evaluate the medical evidence regarding his lumbar degenerative disc disease, compare it to Listing 1.04A, and give an explained conclusion as to why Madden failed to meet or equal it. He further claims the ALJ misread the medical evidence regarding the severity of his condition, including the evidence of nerve root compromise set forth in the October 2012 MRI of his lumbar spine.

18

Finally, Madden asserts "the ALJ's own review of the medical records cannot substitute for a proper evaluation by a Medical Expert particularly when a listing appears to be met or equaled." (Doc. No. 15 at 11.)

The Commissioner maintains the ALJ did, in fact, thoroughly summarize the evidence and explain why Madden did not meet or equal Listing 1.04A.  Moreover, the Commissioner notes that Dr. Vorster concluded Madden's October 2012 MRI did not demonstrate further degeneration since the previous MRI or nerve root compromise.  She further emphasizes numerous findings in the record of normal motor examinations and muscle strength, as well as negative straight leg raising tests.  Thus, the Commissioner argues substantial evidence supports the ALJ's finding that Madden did not meet or equal any section of the Listings.

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 2010 WL 2294531 at * 3 (6th Cir. June 7, 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a), 416.925(a).  In other words, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3).  It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *See e.g. Lett v. Colvin*, 2015 WL 853425 at * 15 (N.D. Ohio Feb. 26, 2015); *Snyder v. Comm'r of Soc. Sec.*, 2014 WL 6687227 at * 7 (N.D. Ohio Nov. 26, 2014).  A claimant must satisfy all of the criteria to "meet" the listing.  *Id.*; *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).  However, a claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at

19

least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 3-4 (6th Cir. April 1, 2011); *Smith-Johnson v. Comm'r of Soc. Sec.*, 2014 WL 4400999 at * 5-6 (6th Cir. Sept. 8, 2014); *Taltoan v. Colvin,* 2014 WL 5795561 at * 6 (N.D. Ohio Nov. 6, 2014); *Hunter v. Comm'r of Soc. Sec.*, 2011 WL 6440762 at * 3-4 (N.D. Ohio Dec. 20, 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for his decision. *See Reynolds,* 2011 WL 1228165 at * 4-5; *Taltoan,* 2014 WL 5795561 at * 6, *Marok v. Astrue*, 2010 WL 2294056 at *3 (N.D. Ohio Jun. 3, 2010); *Waller v. Comm'r of Soc. Sec.*, 2012 WL 6771844 at * 3 (N.D. Ohio Dec. 7, 2012); *Keyes v. Astrue*, 2012 WL 832576 at * 5-6 (N.D. Ohio March 12, 2012).

Here, the ALJ determined at step two of the sequential evaluation process that Madden suffered from the severe impairments of degenerative disc disease of the cervical and lumbar spines; substance abuse; learning disability; and, depression. (Tr. 30.) Thus, at step three, the ALJ was required to consider whether Madden's mental and physical impairments, alone or in combination, met or equaled one of the listed impairments in 20 C.F.R. 404, Subpt P, Appendix 1.

At the hearing, Madden argued that his degenerative disc disease of the lumbar spine met Listing 1.04. (Tr. 50.) This Listing provides as follows:

> **1.04 *Disorders of the spine*** (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg

raising test (sitting and supine).

20 C.F.R. Part 404, Subpart P, App. 1. [11]

The ALJ's step three analysis with respect to this Listing is as follows:

No treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment.  In reaching the conclusion that the claimant does not have an impairment or combination of impairments that meet or medically equal a listed impairment, I also considered the opinion of State Agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion (20 CFR 404.1527(f), 416.927(f) and Social Security Ruling 96-6p).  All of the listings were considered in reaching this finding, with specific emphasis on listings 1.04, 12.02, 12.04, and 12.09.

Relevant to listing 1.04, the record does not support that the claimant is unable to effectively engage in fine and gross manipulation.  Even at recent physical examinations, the claimant is reported to have normal strength, sensation and reflexes in the upper extremities.  While grip strength is reduced, the treating source attributes this to poor effort (B23F/2).  The claimant reports the use of a walker; however, no prescription has been found within the record, and his gait is periodically reported as normal and unassisted (B11F/6) and with normal posture and gait (B16F/61).

(Tr. 30-31.)

The Court finds the ALJ failed to sufficiently articulate his step three analysis of Madden's lumbar degenerative disc disease.  While the decision does cite Listing 1.04A and discuss some of the medical evidence relating to this impairment, the ALJ does not clearly explain how the cited evidence relates to any of the specific requirements of the Listing.  In other words, it is not clear to the Court how the ALJ's conclusions regarding Madden's grip strength, alleged lack of a prescription for a walker, and periodically normal gait and posture relate to the particular requirements set forth in Listing 1.04A.  Moreover, although it is not entirely clear, it appears the ALJ's step three analysis fails to address in any manner a number of Listing 1.04A's requirements, including evidence of nerve root compromise, neuro-anatomic distribution of pain, limitation of motion of the spine, and/or positive straight leg raising.  This is particularly problematic here because, as set forth in the Medical Evidence section of this

---

[11]  In his Brief, Madden quotes Listing 1.04A and argues the ALJ erred in failing to sufficiently evaluate whether he met this particular Listing. Madden does not make any argument with respect to Listings 1.04B or 1.04C and, therefore, these sections will not be considered herein.

Opinion and discussed in more detail *infra*, there are numerous treatment notes in the medical record indicating decreased range of motion in Madden's lumbar spine (Tr. 749, 862, 859, 855, 851, 848, 844, 838, 876, 870, 917); positive straight leg raising (Tr. 749, 862, 859, 855, 851, 848, 844, 838 ); pain in Madden's lower back radiating down his left leg[12] (Tr. 748, 862, 859, 856, 851, 848, 844, 837, 871); as well as objective medical evidence indicating nerve root compression. (Tr. 892.)

Moreover, in addition to the fact that the decision fails to clearly correlate its evaluation of the medical evidence with the specific requirements of the Listing, the ALJ's analysis is further flawed because several of the findings that are articulated at step three are either incorrect or based on a highly selective reading of the medical record.  For example, the ALJ states that "[t]he claimant reports the use of a walker; however, no prescription has been found within the record."  (Tr. 31.)  The medical record, however, clearly reflects that Madden was in fact prescribed a walker by Dr. Lababidi on May 15, 2012.  (Tr. 860.)  Specifically, Dr. Lababidi's treatment note from this date states (in relevant part): "Start Walker Glide Brake Miscellaneous– with seat and brakes, 1, as directed for unsteady gait;" and, "will order walker due to unsteady gait." *Id*.  In addition, the next treatment note in the record from Dr. Lababidi (dated June 12, 2012) lists a walker as one of Madden's "current medications."[13]  (Tr. 854.)

The decision also states that Madden's "gait is periodically reported as normal and unassisted (B11F/6) and with normal posture and gait (B16F/61)."  (Tr. 31.)  While it is true that these two particular exhibits indicate findings of normal gait,[14] the record reflects Madden

_____

[12] There is also evidence in the record that Madden was diagnosed with radiculopathy of the cervical and lumbar spines.  *See e.g.* Tr. 855-856. 859, 884.

[13] This treatment note also indicates that Madden's insurance company would not pay for a walker, so Madden "continues to use a cane." (Tr. 854.)

[14] The first exhibit mentioned by the ALJ, B11F/6, is an emergency room report dated November 20, 2011.  (Tr. 721.)  Madden presented to the ER on this date for treatment of his chronic neck and arm pain.  *Id*.  The second exhibit cited by the ALJ is "B16F/61."  Exhibit B16F is only 13 pages in length; thus, there is no document in the record that corresponds to

was described as having an antalgic, abnormal, limp, unsteady, and/or unstable gait at eighteen (18) separate physician visits in 2012 and 2013 alone. (Tr. 749, 862, 859, 855, 851, 848, 844, 838, 888, 883, 876, 871, 917, 911, 904, 899.) There are also repeated and consistent references to Madden's use of a cane or walker during this time period. (Tr. 855, 851, 832, 848, 844, 838, 876, 871, 917, 894, 911, 904, 897, 888, 883.) None of this evidence is mentioned or discussed by the ALJ in his step three analysis.

Additionally, the ALJ states that recent examinations found Madden had normal strength and sensation in his upper extremities. (Tr. 31.) However, he fails to acknowledge or address, at any point in the decision, the many treatment notes in the medical record documenting diminished sensation and (often severe) decreased strength in Madden's left upper extremity. *See e.g.* Tr. 757, 752, 749, 862, 859, 855, 851, 848, 844, 838. Moreover, while Dr. Vorster did attribute Madden's reduced grip strength to "poor effort" in January 2013, the ALJ fails to mention that this same treatment note indicates Madden's poor effort in this regard was "due to pain." (Tr. 899.)

While the ALJ's step three analysis may be lacking, the Sixth Circuit has held that courts should consider an ALJ's step three analysis "'in the context of the entire administrative decision, and may use other portions of a decision to justify the ALJ's step-three analysis.'" *Smith-Johnson*, 579 Fed. Appx. at 435, fn. 9 (quoting *Snoke v. Astrue*, 2012 WL 568986 at * 6 (S.D. Ohio Feb. 22, 2012)). *See also Forrest v. Comm'r of Soc. Sec.,* 591 Fed. Appx. 359, 366 (6th Cir. 2014); *Snyder v. Comm'r of Soc. Sec.*, 2014 WL 6687227 at * 9 (N.D. Ohio Nov. 26, 2014); *Reiser v. Comm'r of Soc. Sec.,* 2012 WL 6138987 at * 7 (S.D. Ohio Dec. 11, 2012). Moreover, "the ALJ's lack of adequate explanation at Step Three can constitute harmless error where the review of the decision as a whole leads to the conclusion that no reasonable fact finder, following the correct procedure, could have resolved the factual matter in another

---

"B16F/61." However, the Court notes that B16F/6 is a physical therapy note dated August 20, 2012, in which the therapist describes Madden as having normal posture and gait after completion of a 45 minute therapy session. (Tr. 813.)

manner." *Lett*, 2015 WL 853425 at * 16.  *See also Ford v. Comm'r of Soc. Sec*., 2015 WL 1119962 at * 17 (E.D. Mich. March 11, 2015) (finding that "the ALJ's analysis does not need to be extensive if the claimant fails to produce evidence that he or she meets the Listing"); *Mowry v. Comm'r of Soc. Sec*., 2013 WL 6634300 at * 8 (N.D. Ohio Dec. 17, 2013); *Hufstetler v. Comm'r of Soc. Sec*., 2011 WL 2461339 at * 10 (N.D. Ohio June 17, 2011).

Here, at step four, the ALJ does provide a cursory review of some of the medical evidence regarding Madden's lumbar degenerative disc disease.  (Tr. 33-34.)  Specifically, the ALJ mentions the October 29, 2012 MRI of Madden's lumbar spine, stating that it showed "possible" effect on the exiting L4 nerve root.  (Tr. 33.)  The decision also mentions x-rays of Madden's lumbar spine from October 2010, June 2011, and January 2013, which were within normal limits.  *Id*.  Additionally, the ALJ states that "physical examinations included in the record have consistently, albeit not universally, reported either mild or normal findings," and then points to four particular records documenting some normal findings as to strength, sensation, range of motion and reflexes.  (Tr. 33-34.)  Lastly, the decision briefly describes Madden's course of treatment, including his use of prescription medications and a TENS unit, as well as his injections and unsuccessful course of physical therapy.  (Tr. 34.)

Madden argues the ALJ's analysis of his lumbar degenerative disc disease is flawed for several reasons.  First, he argues the ALJ "misread the evidence of nerve root compromise in the [October 29, 2012] MRI" because she incorrectly quoted that MRI as finding "possible" mass-effect on the exiting L4 nerve root when, in fact, that MRI found "probable" mass-effect on the L4 nerve root.  Madden maintains that "[w]ith the ALJ's misunderstanding of the use of the word 'possible' versus 'probable' as was in the report, she never took the next step of explaining why the compromise of the nerve root was not germane in this case."  (Doc. No. 15 at 12.)  Additionally, Madden argues the ALJ failed to consider the record as a whole and "chose specific records and sources to favor without explaining her decision to do so" and "ignored certain reports, or discredited certain reports, without explanation." *Id*. at 13.

The Commissioner argues Madden has failed to demonstrate that he meets all the criteria

24

of Listing 1.04.  She notes there is no evidence Madden was ever diagnosed with spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication and, further, no evidence he had motor loss accompanied by sensory or reflex loss and positive straight leg raising tests (sitting and supine).  Finally, the Commissioner argues the ALJ's misreading of the October 29, 2012 MRI is harmless because Dr. Vorster subsequently interpreted that report as showing "no instability or neural compromise."  (Doc. No. 17 at 13.)

The Court finds the decision's relatively brief discussion of the medical evidence at step four is not sufficient to cure the deficiencies of its step three analysis.  As an initial matter, the decision fails to adequately address the results of the MRIs of Madden's lumbar spine or discuss how those results relate to requirements of Listing 1.04A.  As noted *supra*, Madden underwent an MRI on March 22, 2012, which was interpreted by radiologist Jonathan Tanner, M.D., as showing (1) moderate to severe central canal stenosis at the L3-L4 level due to disk bulging and broad-based left paracentral disk herniation; and, (2) L4-L5 right intraforaminal disk herniation with **possible mass-effect on the exiting right L4 nerve root**.  (Tr. 761) (emphasis added).  Madden presented to Dr. Vorster one week later, on March 29, 2012, at which time Dr. Vorster discussed this MRI and stated that "[a]t the L3-L4 level, there is a broad-based paracentral disk herniation **causing thecal sac and nerve root compression.**  At L4-5, there is a smaller intraforaminal disk herniation on the right." (Tr. 892) (emphasis added). Seven months later, on October 29, 2012, Madden underwent another MRI of his lumbar spine, which was again interpreted by Dr. Tanner.  (Tr. 878-879.)  This MRI showed (1) L3-L4 disk bulging and broad-based disk herniation with moderate central canal stenosis; and, (2) L4-L5 right intraforaminal disk herniation with **probable mass-effect on the right L4 nerve root**. (Tr. 878) (emphasis added).  That same day, Madden presented to Dr. Vorster, who found as follows: "Reviewed MRI from today and MRI from earlier in the year.  Scans are very similar and there is no additional degeneration. . . . . Pointed out XR and MRI to pt and friend, as well as side by side comparison with studies from 3/2012.  No instability or neural compromise." (Tr. 884.)

While the ALJ mentions the October 2012 MRI, the decision incorrectly states that it found possible, rather than probable, mass effect on the right L4 nerve root.  Standing alone, this error might not be cause for concern.  However, the decision also failed to discuss Madden's previous MRI from March 2012 or Dr. Vorster's analysis of either the March 2012 or October 2012 MRIs.  Nor does the decision contain any discussion as to how this evidence might relate to the requirements of Listing 1.04A, specifically the requirement that the claimant show "compromise of a nerve root (including the cauda equina) or the spinal cord" and "evidence of nerve root compression."  20 C.F.R. Part 404, Subpart P, App. 1, Listing 1.04.  Absent any discussion of this evidence in the decision, the Court cannot determine that the ALJ fully considered this evidence in the context of the Listing.  This lack of explanation and analysis prevents the Court from conducting a meaningful judicial review of the ALJ's determination that Madden failed to meet or equal the requirements of Listing 1.04A.

The Commissioner appears to argue that the ALJ's step three determination should be upheld because the medical evidence does not establish that Madden's lumbar degenerative disc disease satisfies the criteria for Listing 1.04A.  However, the Court finds Madden has come forward with sufficient medical evidence relating to the requirements of this Listing to warrant remand.  As noted *supra*, the ALJ found at step two that Madden's degenerative disc disease constituted a severe impairment, and degenerative disc disease is, in fact, identified as one of the conditions that may qualify as disorder of the spine under Listing 1.04A.  Moreover, there are numerous treatment records indicating findings of neuro-anatomic distribution of pain (Tr. 748, 862, 859, 856, 851, 848, 844, 837, 871); limitation of motion of the spine (Tr. 749, 862, 859, 855, 851, 848, 844, 838, 876, 870, 917); and, positive straight leg raising (Tr. 749, 862, 859, 855, 851, 848, 844, 838).

There is also evidence in the record suggesting "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss."  Specifically, Listing 1.00E notes that "inability to walk on the heels or toes, to squat, or to arise from a squatting position, when appropriate, may be considered evidence of significant motor loss."  In

26

March 2012, Dr. Vorster found Madden "seems to be unable to squat down, step onto a step-up or even flex the hip."  (Tr. 892.)  He also noted Madden was "unable to place any weight on his left leg."  *Id.*  Moreover, there are numerous treatment records indicating Madden experienced difficulty rising from a seated position, as well as documentation of diminished strength and sensation in his upper and/or lower extremities.  *See e.g.* Tr. 757, 752, 749, 862, 858-859, 855, 851, 848, 844, 838.

The record also contains evidence of nerve root compression.  Specifically, Dr. Vorster found that the March 2012 MRI showed thecal sac and nerve root compression at the L3-L4 level.  (Tr. 892.)  Listing 1.04 also states, however, that a claimant must show disorder of the spine "resulting in compromise of the nerve root (including the cauda equina) or the spinal cord."  It is not clear to this Court whether this requirement may be satisfied by either Dr. Vorster's finding of  nerve root compression at L3-L4 or, alternatively, the October 2012 MRI finding of "probable mass-effect on the exiting L4 nerve root."  It is also unclear to this Court whether Dr. Vorster's conclusion that the October 2012 showed "no neural compromise" definitively demonstrates that Madden's condition did not result in "compromise of the nerve root . . . or the spinal cord."  As noted above, the ALJ failed to accurately discuss or consider this evidence or apply it in the context of the Listing's requirements, and the Court is unwilling to make this determination in the first instance based on the record.

In sum, and reviewing the decision as a whole, the Court finds the ALJ failed to accurately and thoroughly evaluate the medical evidence regarding Madden's lumbar degenerative disc disease and compare it to the requirements of Listing 1.04A.  As such, the decision deprives the Court of any ability to conduct a meaningful review as to whether the regulations were followed.  Because the Court cannot discern the reasons for the ALJ's decision, the Court finds remand is necessary to allow the ALJ to provide a more thorough step three analysis.[15]

_____

[15] In the interest of judicial economy, the Court will not consider Madden's remaining assignment of error.

## VII.  Decision

For all of the foregoing reasons, the Court finds the decision of the Commissioner not supported by substantial evidence.  Accordingly, the decision is VACATED and the case is REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this opinion.

IT IS SO ORDERED.


<u>/s/ Greg White</u>
U.S. Magistrate Judge

Date: June 10, 2015